**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| THOMAS JOHN STYCZINSKI; TOM "THE COIN GUY", LLC; TREASURE ISLAND COINS, INC.; and NUMISMATIST UNITED LEGAL DEFENSE, | Case No. 20-CV-2019 (NEB/BRT) |
| Plaintiffs, | ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO DISMISS |
| v. | |
| GRACE ARNOLD, in her capacity as Commissioner of the Minnesota Department of Commerce, | |
| Defendant. | |

---

Several coin dealers and an association of coin dealers[1] (collectively, the "Coin Dealers") sued Grace Arnold, the Commissioner of the Minnesota Department of Commerce, alleging that Minnesota's statute regulating bullion dealers is unconstitutional or preempted by federal law. The Coin Dealers moved for summary judgment, and Commissioner Arnold moved to dismiss. For the reasons below, the Court grants and denies both motions in part.

---

[1] The plaintiffs are Thomas John Styczinski; Tom "The Coin Guy", LLC; Treasure Island Coins, Inc.; and Numismatist United Legal Defense.

## BACKGROUND

This lawsuit challenges the Minnesota statute regulating "bullion product dealers," a classification that generally includes coin dealers.[2] The statute imposes certain requirements and prohibitions on bullion product dealers and their representatives. *See* Minn. Stat. §§ 80G.01–.11. The plaintiff Coin Dealers challenge the constitutionality of the law, and the dispute centers around the definition of "dealer" and the requirements imposed upon dealers by the law. These requirements apply only to those who meet dealer status under the law.

The definition of dealer is, at a minimum, less than straightforward. To begin, under the statute a "dealer" is a person or entity "who buys, sells, solicits, or markets bullion products or investments in bullion products to consumers" and who satisfies one of three requirements: (1) being "incorporated, registered, domiciled, or otherwise located in" Minnesota; (2) having a "dealer representative"[3] in Minnesota; or (3) who "does business with a consumer at a location in this state, or delivers or ships a bullion product or makes a payment to a consumer at an address in this state, unless the

---

[2] A "bullion product" is "any coin, round, bar, or ingot containing silver, gold, platinum, palladium, or other precious metal." Minn. Stat. § 80G.01, subdiv. 2.

[3] A "dealer representative" is a person who acts as "an employee, contractor, or agent of a dealer and who "interact[s] with consumers for the purpose of the buying, selling, solicitation, or marketing of bullion products or investments in bullion products." Minn. Stat. § 80G.01, subdiv. 4.

transaction occurs when the consumer is at a business location outside of this state." *Id.* § 80G.01, subdiv. 3(a).

It gets more complex from there. Even if a person or entity meets the above definition under subdivision 3(a), they may still be exempted from dealer status under subdivision 3(b). Examples include wholesalers, those who sell exclusively at garage or estate sales, securities brokers, auctioneers, people who only sell at twelve or fewer Minnesota trade shows per year, and banks and other financial institutions. *Id.* § 80G.01, subdiv. 3(b).

The next step is determining what obligation the law imposes upon dealers. If a person or entity meets the definition of dealer, does not qualify for exemptions, *and* transacts $25,000 or more in bullion products in a year, they must register with the commissioner of commerce and pay a $25 registration fee. *Id.* § 80G.02, subdivs. 1, 5. Conducting business after failing to register is a misdemeanor. *Id.* § 80G.08. Additionally, a dealer must maintain a surety bond in an amount determined by its transactions with Minnesota consumers in the twelve-month period prior to registration or renewal.[4] *Id.* § 80G.06, subdiv. 1.

---

[4] At the time this suit was filed, and until after the hearing on the parties' motions, a dealer only needed to maintain a surety bond if its sales in the previous twelve months were $25,000 or greater. Minn. Stat. § 80G.06 (2016). In addition, the surety bond section contained no language geographically limiting the transactions that counted toward the surety bond threshold. *See id.* While the motions were under advisement, the Minnesota Legislature amended the surety bond portion of the bullion dealer law. (ECF Nos. 36, 36-1 at 20.) Now, only transactions with Minnesota consumers count toward the surety

And, in addition to the registration and bond requirements, the bullion dealer law regulates a dealer's sales practices. Among other things, a dealer must: provide a consumer with an invoice, investigate any consumer complaints, deliver bullion products to the consumer in the agreed-upon timeframe, refrain from misrepresenting any material aspect of a bullion product, and stop calling a consumer after the consumer requests not to be contacted. *Id.* § 80G.07, subdiv. 1. The commissioner of commerce has authority to enforce the bullion dealer law, and Commissioner Arnold has used this authority. *Id.* § 80G.10, subdivs. 1–2; (ECF No. 1 ("Compl.") ¶¶ 28, 31–35.)

The Coin Dealers bringing this lawsuit would like to transact in bullion products without registering or posting a bond, and so they challenge the legality of the bullion dealer law. (Compl. ¶¶ 40–44.) First, they claim that the bullion dealer law violates the Dormant Commerce Clause in three ways: it excessively burdens interstate commerce, it discriminates against out-of-state commerce, and it regulates conducts outside of Minnesota. (*Id.* ¶¶ 45–123.) Second, they claim that the bullion dealer law violates the Fourteenth Amendment because it is impermissibly vague. (*Id.* ¶¶ 124–44.) Third, the Coin Dealers claim that the bullion dealer law is preempted because it conflicts with federal laws and policies related to coins issued by the United States Mint and Individual Retirement Accounts ("IRAs"). (*Id.* ¶¶ 145–86.) Both parties filed a dispositive motion:

---

bond threshold, and dealers must maintain a surety bond even if they sold less than $25,000 worth of bullion products in the past year. Minn. Stat. § 80G.06 (2021).

the Coin Dealers for summary judgment and Commissioner Arnold to dismiss for failure to state a claim and, for the Coin Dealers' IRA preemption claim, for lack of subject matter jurisdiction. (ECF Nos. 19, 26.)

## ANALYSIS

The Court must grant the Coin Dealers' summary judgment motion if they show "that there is no genuine dispute as to any material fact and the[y are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Neither party disputes any material facts, making this a purely legal issue. As for Commissioner Arnold's motion to dismiss, the Court accepts the facts as alleged in the Coin Dealers' Complaint and asks only whether the facts they pled would entitle the Coin Dealers to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Cnty. of St. Charles v. Mo. Fam. Health Council*, 107 F.3d 682, 684–85 (8th Cir. 1997) (affirming the district court's grant of a motion to dismiss on a matter of statutory interpretation).

## I.      Dormant Commerce Clause

The Coin Dealers' first three challenges to the law are under the Dormant Commerce Clause. The Commerce Clause grants Congress the power to "regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. The negative implication of this power, the Dormant Commerce Clause, is that states may not enact laws that "unduly restrict interstate commerce." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019). The Coin Dealers claim that the bullion dealer law

violates the Dormant Commerce Clause in three ways: it unduly burdens interstate commerce, it discriminates against out-of-state commerce, and it is impermissibly extraterritorial in its scope. (Compl. ¶¶ 45–123; ECF No. 21 at 16–30; ECF No. 31 at 2–20.)

### A. Statutory Interpretation

The parties' Dormant Commerce Clause arguments depend on the scope of the bullion dealer law. (*E.g.*, ECF No. 29 at 6–8; ECF No. 31 at 4–7.) Determining the scope of the law is crucial to these claims because the parties' contrasting interpretations impact the degree to which the law burdens interstate commerce. Most notably, the Coin Dealers claim that purely out-of-state transactions count toward the $25,000 threshold that triggers the registration requirement; Commissioner Arnold argues that they do not. Thus, the Court must engage in statutory interpretation.

The parties have not cited, and the Court cannot find, any Minnesota Supreme Court case interpreting the bullion dealer law.[5] Because the Minnesota Supreme Court has not interpreted the bullion dealer law, the Court must "'predict, as best [it] can, how [the Minnesota Supreme Court] would decide the issue'" of the law's scope. *Qwest Comms. Co., LLC v. Free Conferencing Corp.*, 905 F.3d 1068, 1074 (8th Cir. 2018) (internal quotation and citation omitted); *see also Progressive N. Ins. Co. v. McDonough*, 608 F.3d 388, 390 (8th Cir. 2010) (noting that a federal court is "bound by decisions of the highest state court when interpreting state law").

---

[5] Or, for that matter, any Minnesota Court of Appeals case interpreting the law.

When interpreting a statute, the Minnesota Supreme Court first asks whether the statute is ambiguous on its face. *Wilbur v. State Farm Mut. Auto. Ins. Co.*, 892 N.W.2d 521, 523 (Minn. 2017) (citation omitted). A statute is ambiguous only when "the language therein is subject to more than one reasonable interpretation." *Id.* (citation omitted). If the statute is not ambiguous, the Court stops there. *Roberts v. State*, 933 N.W.2d 418, 423 (Minn. Ct. App. 2019) (citing *State v. Peck*, 773 N.W.2d 768, 772 (Minn. 2009)).

As noted above, the critical issue in this case is determining which transactions count toward the $25,000 threshold that triggers the registration requirement. The plain language of Section 80G.02 unambiguously counts out-of-state transactions toward this threshold, especially in light of the amendments made to the law.[6] There is no support in the text of the statute for Commissioner Arnold's argument to the contrary, and when the text of the statute is unambiguous, the Court cannot read words into the statute that are not in the text. *In re Matter of Dahlgren Twp.*, 906 N.W.2d 512, 518 (Minn. Ct. App. 2017) (citing *Reiter v. Kiffmeyer*, 721 N.W.2d 908, 911 (Minn. 2006)). The registration requirement counts transactions "in the aggregate" and lacks a geographic limit regarding which transactions count. Minn. Stat. § 80G.02, subdiv. 1. Nor is the definition of "dealer" geographically limited. *Id.* § 80G.01, subdiv. 3. Aside from the surety bond requirement,

---

[6] The Minnesota legislature, by amending the surety bond section of the law to include only transactions with Minnesota consumers, showed that it is able to geographically limit transactions that count toward a threshold when it so wishes. Minn. Stat. § 80G.06 (2021). The legislature did not add such a limit to the registration requirement in Section 80G.02.

the law does not state that only transactions in Minnesota count, and the Court cannot read that limitation into the law. *See Premier Bank v. Becker Dev., LLC*, 785 N.W.2d 753, 760 (Minn. 2010) (explaining that under the Minnesota Supreme Court's rules of statutory construction, a court cannot add words or meaning to a statute when the legislature has omitted or overlooked them).

An example illustrates: an Iowa coin dealer sells $25,000 worth of bullion products in Iowa and a single coin for one dollar in Minnesota. That coin dealer is a "dealer" under the statute because she sold bullion products to a consumer in Minnesota.[7] Minn. Stat. § 80G.01, subdiv. 3(a)(3). And she would have to register because she sold $25,001 worth of bullion products "in the aggregate"—under the plain language of the statute, it does not matter where those aggregate sales took place, just that they summed to $25,000. *Id.* § 80G.02.

Similarly, Minnesota coin dealers would be required to register even if they only transacted bullion products out of state. Take a hypothetical Minnesota coin dealer who traveled to a trade show in Wisconsin and sold a bullion product worth $25,000. That coin dealer is a dealer under the statute, because she sold a bullion product and is domiciled

---

[7] This hypothetical assumes that the coin dealer does not qualify for any of the Section 80G.01, subdivision 3(b) exceptions.

in Minnesota.[8] *Id.* § 80G.01, subdiv. 3(a)(1). She would have to register because she sold

$25,000 or more in bullion products. *Id.* § 80G.02.

This reading is supported by the Eighth Circuit's decision in *Olson v. Push, Inc.*,

640 F. App'x 567 (8th Cir. 2016). In *Olson,* the Eighth Circuit, applying Minnesota rules of

statutory interpretation, interpreted the Minnesota Drug and Alcohol Testing in the

Workplace Act's ("DATWA") definition of "employer." *Id.* at 569–70. The statute defined

an "employer" as "a person or entity located or doing business in [Minnesota] and having

one or more employees." *Id.* at 569 (citing Minn. Stat. § 181.950, subdiv. 7). The parties

disagreed whether "employer" covered the out-of-state employees of an entity that does

business in Minnesota. The Eighth Circuit interpreted the statute broadly, reasoning that

DATWA contained no limiting language restricting its applicability to only Minnesota-

based employees. *Id.* at 569–70. As in *Olson,* the bullion dealer law contains no limiting

language suggesting that only Minnesota sales count toward the $25,000 registration

threshold.

In sum, the registration requirement contains no geographic limiting language,

and the Court cannot read into the statute a modification that is not there. *See Dahlgren*

*Twp.,* 906 N.W.2d at 518 (citation omitted); *Roberts,* 933 N.W.2d at 423 (explaining that

when a statute is clear on its face, a court considers no other factors) (citation omitted).

---

[8] Again assuming that the coin dealer does not qualify for any of the subdivision 3(b) exceptions.

The Court analyzes the Coin Dealers' Dormant Commerce Clause claims under this interpretation of the law.

### B. Discrimination Against Out-of-State Commerce

The Coin Dealers claim that the bullion dealer law unconstitutionally discriminates against out-of-state trade shows. Because the Coin Dealers are claiming injury to entities other than themselves, the Court must first assess whether they have standing to bring such a challenge. *See Raines v. Byrd*, 521 U.S. 811, 819 (1997).

### 1. Standing

A plaintiff must establish standing to bring each claim, including an injury-in-fact.[9] *Town of Chester v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1650 (2017); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014) (explaining that a plaintiff must establish the elements of standing for each claim). Among other things, the injury must be particularized and specific to the plaintiff, ensuring that the plaintiff has a "personal stake" in the outcome. *Raines*, 521 U.S. at 819 (emphasizing the personal nature of the injury requirement) (citations omitted). In the Commerce Clause context, plaintiffs can establish injury by showing that a law's alleged discrimination against some other out-of-state entity financially harms them. *See S.D. Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 592 (8th Cir. 2003) (holding that companies that lost business as a result of a law that

---

[9] Aside from the Coin Dealers' IRA preemption claim, discussed below, there is no challenge to the Coin Dealers' standing to bring their other claims, and the Court concludes that the Coin Dealers have standing for those claims.

discriminated against out-of-state entities had standing, even though the law did not discriminate against the plaintiffs); *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 286–87 (1997) (concluding that a car manufacturer, against whom the statute at issue did not discriminate, had standing to bring a Dormant Commerce Clause challenge because the discrimination would force it to pay more for an input purchased from out-of-state). Additionally, a plaintiff has standing when violating the allegedly discriminatory law would subject the plaintiff to a credible threat of enforcement. *Alexis Bailly Vineyard, Inc. v. Harrington*, 931 F.3d 774, 778 (8th Cir. 2019) (holding that a vineyard had standing to challenge a law that discriminated against out-of-state ingredient suppliers when the vineyard intended to purchase from an out-of-state supplier and faced a credible threat of prosecution if it bought ingredients from those suppliers).

Some of the Coin Dealers have established that they face injury resulting from the bullion dealer law's discrimination against out-of-state trade shows. First, the Coin Dealers have standing because they face a credible threat of enforcement if they engage in conduct that the allegedly discriminatory law curtails. Under the law, the Coin Dealers cannot sell at an out-of-state trade show without losing eligibility for an exception to dealer status. Thus, if they sell at an out-of-state trade show and are ineligible for the other exceptions, they must register.[10] As the Coin Dealers have alleged, if they continue

---

[10] Assuming they meet the $25,000 registration threshold.

to do business without registering, they face a threat of enforcement, so they have standing. (Compl. ¶¶ 28–39); *Alexis Bailly*, 931 F.3d at 778.

Second, as in *Hazeltine*, some of the Coin Dealers have standing because they face financial harm from the discrimination. Styczinski and other plaintiffs[11] would like to participate in out-of-state trade shows without having to register. (Compl. ¶¶ 40(e), 43(f).) Under subdivision 3(b)(5), Styczinski is not considered a dealer if he engages in no more than twelve in-state trade shows. Minn. Stat. § 80G.01, subd. 3(b)(5). But if he participates in a single out-of-state trade show, he becomes ineligible for the subdivision 3(b)(5) exception. The same is not true if he participates in a single in-state trade show. By being unable to participate in out-of-state trade shows without losing eligibility for the subdivision 3(b)(5) exception, Styczinski (and others like him) are forced to forgo

---

[11] Plaintiffs include an organizational plaintiff, the Numismatist United Legal Defense fund. An organization has standing to sue when (1) its members would have standing; (2) the suit is relevant to the organization's purpose; and (3) individual members' participation in the suit is unnecessary. *Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.*, 831 F.3d 961, 967 (8th Cir. 2016) (citation omitted). Members of the Numismatist United Legal Defense would have standing because they wish to participate in out-of-state trade shows without having to register. (Compl. ¶ 43.) This suit is consistent with the purpose of the Numismatist United Legal Defense fund, which is to "protect [coin dealers' and coin collectors'] legal rights to collect and deal in coins." (*Id.* ¶ 5.) Finally, the Court sees no reason why the individual members of the Numismatist United Legal Defense would have to participate in this suit. Thus, the organization has standing.

potential sales at out-of-state trade shows, decreasing their potential sales and thus causing them financial harm.[12]

    *2.  Merits*

    A state law that discriminates against interstate commerce is generally invalid. *LSP Transmission Holdings, LLC v. Sieben*, 954 F.3d 1018, 1026 (8th Cir. 2020) (citation omitted). There are three ways in which a law might discriminate: on its face, in its purpose, or through its effects. *Id.* (citation omitted). A law discriminates against interstate commerce when it provides for "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Alexis Bailly*, 931 F.3d at 778 (quoting *Or. Waste Sys., Inc. v. Dep't of Env't Quality*, 511 U.S. 93, 99 (1994)). The magnitude of the discrimination is irrelevant—even marginal discrimination violates the Dormant Commerce Clause. *Associated Indus. of Mo. v. Lohman*, 511 U.S. 641, 650 (1994) (citations omitted). If the law is discriminatory, Commissioner Arnold must show, under "'rigorous scrutiny'" that the law "serves some legitimate purpose unrelated to limiting interstate commerce and that the [law] is the only possible way to achieve this purpose." *U & I Sanitation v. City of Columbus*, 205 F.3d 1063, 1067–68 (8th Cir. 2000) (citations omitted).

---

[12] Plaintiff Treasure Island Coins, Inc. is not similarly situated. It has not alleged that it wishes to participate in out-of-state trade shows without registering, so the Court cannot conclude that it faces a threat of financial harm. Thus, it lacks standing to bring a Dormant Commerce Clause discrimination claim under the theory of financial harm.

The bullion dealer law discriminates against out-of-state trade shows on its face and through its effects. The law allows coin dealers to sell at up to twelve in-state trade shows per year without registering,[13] but it does not afford the same privilege to those selling at out-of-state trade shows. This differential treatment makes in-state trade shows more attractive than out-of-state shows. All else equal, a bullion dealer would prefer to take part in a Minnesota trade show, and thus retain eligibility for a dealer status exemption, than an out-of-state trade show which would automatically cause them to forfeit eligibility for that exemption. In other words, the bullion dealer law impermissibly benefits in-state commerce and burdens out-of-state commerce. *LSP Transmission*, 954 F.3d at 1026.

The next question, then, is whether Minnesota has another way to advance the legitimate interest served by this law. *U & I Sanitation,* 205 F.3d at 1068. The law serves to regulate bullion dealers and protect the public from unscrupulous business practices in bullion transactions. Representative Hilstrom, *Statement on HF157,* (May 15, 2013), at 39:33–40:02, https://www.house.leg.state.mn.us/hjvid/88/880378 [hereinafter *Statement on HF157*] (explaining that the bill is designed to protect the public, and specifically seniors, from fraudulent and unscrupulous coin dealers). But excepting Minnesota-trade-show-only dealers does not serve this purpose. The law would serve the state's purposes just

---

[13] Assuming the coin dealer does not transact in coins anywhere other than the in-state trade shows.

14

as well, if not better, without the subdivision 3(b)(5) exception. More bullion dealers would then be covered by the law, expanding its protections. Exempting participants at in-state trade shows from dealer status is not necessary to protect the public from unsavory business practices in bullion transactions. Because the in-state trade show exception discriminates against out-of-state commerce and is not the only way to advance the state's interest, it is unconstitutional.

   3.  *Remedy*

In Minnesota,[14] a statute is generally severable. Minn. Stat. § 645.20. A statute is only non-severable if: (1) the statute includes a provision saying it is not severable; (2) the valid and the void portions of the statute are so interconnected and dependent on each other that the legislature would not have enacted the statute in its severed form; or (3) the valid provisions, by themselves, are "incomplete and are incapable of being executed in accordance with the legislative intent." *Id.* None of these three apply. Chapter 80G has no non-severability provision, and the Court cannot conclude that the in-state trade show exception of subdivision 3(b)(5) is so interconnected with the rest of the bullion dealer law that the legislature would not have enacted it in its severed form. Finally, the bullion dealer law is not incomplete without this provision. The registration and bond requirements of Sections 80G.02 and 80G.06 still apply, and even without the in-state

---

[14] The severability of a state statute is a matter of state law. *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996).

trade show exception, the bullion dealer law is still capable of protecting the public from unsavory bullion dealers.

The Court must next determine how much of subdivision 3(b)(5) to sever. When severing a part of a statute, the Court must "attempt to effectuate the intent of the legislature had it known that a provision of the law was invalid." *State v. Melchert-Dinkel*, 844 N.W.2d 13, 24 (Minn. 2014) (internal quotation and citation omitted). Additionally, and perhaps obviously, the Court should sever as little of the statute as possible. *Back v. State*, 902 N.W.2d 23, 31 (Minn. 2017) (citations omitted). The smallest portion the Court could sever to render the statute constitutional is to strike "in this state" from subdivision 3(b)(5). With those three words stricken, the bullion dealer law no longer favors in-state trade shows over their out-of-state counterparts. Without these words, the law still serves the legislature's intent—to protect the public from unscrupulous bullion dealers. *Melchert-Dinkel*, 844 N.W.2d at 24. Thus, the Court severs "in this state" from subdivision 3(b)(5).

### C.  Undue Burden

Even after finding unconstitutionality on the grounds of discrimination against out-of-state commerce, the Court must still analyze the Coin Dealers' next challenge— that the law places an undue burden on interstate commerce. *LSP Transmission*, 954 F.3d at 1030–31. The Court concludes that it does not. Undue burden claims are evaluated under the *Pike* balancing test, under which a court balances the "legitimate local public

interest against [the law's] incidental burden on interstate commerce." *Id.* at 1030 (citation omitted). A law is invalid if "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Id.* (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). When assessing the burden a statute imposes, a court is not limited to considering the effects on the parties before it, but should "adopt an aggregate analysis whereby [the court] consider[s] the interstate effect on the . . . market if several jurisdictions were to adopt similar [statutes]." *U & I Sanitation*, 205 F.3d at 1069.

The bullion dealer law's impact on interstate commerce is minimal. Registering, paying a $25 fee, and obtaining a surety bond are the only things standing between coin dealers wishing to sell bullion product in Minnesota and being able to do so lawfully. *See Am. Target Advert., Inc. v. Giani*, 199 F.3d 1241, 1254 (10th Cir. 2000) (concluding that requirements that firms register with the state and pay a $250 application fee were minimal burdens on interstate commerce). Although some out-of-state bullion dealers may determine that the benefits of doing business in Minnesota do not outweigh the costs of complying with the requirements, these minimal requirements do not seriously impede interstate commerce. The Dormant Commerce Clause, after all, "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127–28 (1978); *see also Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 313 (1st Cir. 2005) (citation omitted) (explaining that a law does not burden interstate commerce when the only burden is an impact on a

firm's profits). Additionally, the aggregate effect on interstate commerce would be negligible even if several other states adopted similar bullion dealer laws. *See U & I Sanitation*, 205 F.3d at 1069. Though there may be more friction in the bullion products market if this were the case, nothing in these laws would prohibit the interstate sale of bullion products. Instead, bullion dealers would just have to register in several states.

Even if the bullion dealer law somewhat burdens interstate commerce, the law's consumer protection benefits greatly exceed those burdens. The law was enacted in response to a wave of fraudulent practices in the bullion market, including fraudulent solicitation targeting the elderly. *Statement on HF157* at 39:33–40:02 (explaining that the bill is designed to protect the public, and specifically seniors, from fraudulent and unscrupulous coin dealers). Minnesota has an interest in stemming such fraudulent activity. *See Am. Target*, 199 F.3d at 1254 (holding that the state had a legitimate public interest in preventing fraud and noting that "[i]n its legitimate campaign against fraudulent solicitations, the state would be severely hampered if allowed only to regulate in-state solicitors"); *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 503 (5th Cir. 2001) (concluding that preventing fraud and "other abuses of [] citizens" were legitimate public interests) (citation omitted).

### D. Extraterritoriality

The Coin Dealers' next challenge to the law is that it regulates wholly out-of-state commerce. The Court agrees that part of the law—Section 80G.07—does, and that this

section is therefore unconstitutional on this ground. "The Commerce Clause precludes application of a state statute to commerce that takes place wholly outside of the state's borders." *Cotto Waxo Co. v. Williams*, 46 F.3d 790, 793 (8th Cir. 1995) (citing *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989)). A state law that has the effect of controlling out-of-state conduct is per se invalid. *North Dakota v. Heydinger*, 825 F.3d 912, 919 (8th Cir. 2016) (citations omitted). A statute is impermissibly extraterritorial when it "necessarily requires out-of-state commerce to be conducted according to in-state terms." *Cotto Waxo*, 46 F.3d at 794.

Section 80G.07 of the bullion dealer law regulates wholly out-of-state conduct. As discussed above, *supra* Analysis I.A, the definition of "dealer" does not limit dealer status to transactions occurring in Minnesota. Under the plain language of the bullion dealer law, once a person or entity "does business with" a consumer located in Minnesota, they qualify as a dealer, and the bullion dealer law applies to all of the dealer's transactions— whether in Minnesota or outside it. Minn. Stat. § 80G.01, subdiv. 3(a)(3). Likewise, Section 80G.07's regulations on a Dealer's conduct contains no geographically limiting language. So, for instance, any coin dealer who has made at least one transaction in Minnesota is subject to the Section 80G.07 prohibitions for all transactions while they are a dealer, even when located outside of Minnesota and not doing business with a Minnesota consumer. One Minnesota transaction thus renders an individual a "dealer" in Minnesota and makes all the Dealer's transactions subject to Section 80G.07. Thus,

Section 80G.07 applies to commerce that takes place wholly outside Minnesota, making it unconstitutionally extraterritorial.[15]

Because Section 80G.07 is unconstitutionally extraterritorial, the Court will sever it from the bullion dealer law. As stated above, the bullion dealer law does not have a non-severability provision. Whether the rest of the bullion dealer law is "so essentially and inseparably connected with, and so dependent upon" Section 80G.07 is admittedly a closer call than the in-state trade show exception. Minn. Stat. § 645.20. But although Section 80G.07 plays a large role in the law's protection of the public against fraudulent bullion dealers, it is far from the only such protection, and the Court cannot conclude that the legislature would not have enacted the bullion dealer law without it. For the same reasons, the bullion dealer law is not "incomplete" nor "incapable of being executed in accordance with legislative intent" without Section 80G.07. *Id.* The bullion dealer law, even without Section 80G.07, still provides significant consumer protection benefits. Dealers must still register with the state, and the law requires the commissioner to deny

---

[15] Contrary to the Coin Dealers' arguments, no other aspect of the bullion dealer law is extraterritorial, because the other provisions do not require regulated entities to conduct their out-of-state business according to Minnesota's terms. Although out-of-state transactions count toward the registration requirement, *see supra* Analysis I.A, unlike Section 80G.07, Section 80G.02 does not regulate or restrict how dealers conduct their business outside Minnesota. Section 80G.02 merely requires a dealer to register with the state, but it does not dictate the terms of out-of-state transactions. The surety bond requirement, as discussed above, now only covers transactions with Minnesota consumers, so it also does not regulate how dealers conduct their out-of-state business.

the application of anyone who has been convicted within the last ten years of a financial crime or crime involving fraud or theft. Minn. Stat. § 80G.04, subdiv 1. It also gives the commissioner authority to deny, suspend, or revoke a dealer's registration if the dealer violates certain state consumer protection statutes. *Id.* § 80G.03, subdiv. 1(5). In addition, dealers must still acquire a surety bond, which provides recourse to consumers cheated by unscrupulous dealers. *Id.* § 80G.06. Finally, the commissioner still has the power to enforce these requirements. *Id.* § 80G.10.

## II.     Void for Vagueness

The Coin Dealers next challenge the bullion dealer law as void for vagueness. The Court dismisses this claim. A statute violates due process if it is so vague that ordinary people cannot understand what conduct is prohibited or if it "encourage[s] arbitrary and discriminatory enforcement." *Skilling v. United States*, 561 U.S. 358, 402–03 (2010) (citation omitted). The Court must consider whether the bullion dealer law is vague as applied to the Coin Dealers, because "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *United States v. Frison*, 825 F.3d 437, 442 (8th Cir. 2016) (citation omitted).

The Coin Dealers' arguments that the bullion dealer law is unconstitutionally vague fall into three categories: (1) the term "dealer" is vague; (2) there is a "circular interrelation" problem with the definitions of "dealer" and "dealer representative"; and

(3) several terms used in the bullion dealer law are undefined. (ECF No. 21 at 30–34.) None of these three arguments is availing.

### A. "Dealer"

The Coin Dealers claim that the term "dealer" is vague because its definition does not comport with the ordinary use of the term, because the definition can apply to consumers, and because it can refer to someone who has only made one bullion transaction in their entire life. (*Id.* at 30–31.) In Minnesota, words and phrases that are defined in the statute are to be construed according to that definition. Minn. Stat. § 645.08(1). So just because the statute defines "dealer" slightly unconventionally compared to its normal usage does not mean that "[someone] of common intelligence must necessarily guess at its meaning." *United States v. Birbagher*, 603 F.3d 478, 484 (8th Cir. 2010) (citation omitted). Nor is the statute vague because someone who would generally be referred to as a consumer may be a "dealer" under the statute. Again, defined terms are construed according to that definition. Minn. Stat. § 645.08(1). For a coin dealer to determine whether she is a "dealer," she must only ask (1) whether she transacts in bullion products or investments; (2) whether she is incorporated or domiciled in Minnesota, has a dealer representative in Minnesota, or does business with Minnesota citizens; and (3) whether one of the subdivision 3(b) exceptions applies. Minn. Stat. § 80G.01, subdiv. 3. A reasonably intelligent person would have fair notice of whether she is a dealer.

### B.  Circularity

The Coin Dealers also claim that the law is vague because the definition of "dealer" depends, in part, on the definition of "dealer representative" and vice versa. (ECF No. 31 at 31.) Although these terms are defined in relation to each other, *see* Minn. Stat. § 80G.01, subdivs. 3–4, the Court cannot conclude that a person of reasonable intelligence would be unable to figure out whether someone is a "dealer" or "dealer representative" based on this definitional quirk. The Coin Dealers have raised no factual scenario where the cross-incorporated definitions of "dealer" and "dealer representative" would prevent potentially regulated parties from determining whether they are covered by the statute, and the Court is unable to think of such an example.

Take, for example, an Iowa coin dealer who owns a store in Minnesota. The coin dealer never sets foot in Minnesota, and he hires an employee to work at his Minnesota store. There can be no dispute that the Iowa coin dealer is a "dealer," because he sells bullion products and has a representative in Minnesota; similarly, the employee is a dealer representative because he is an employee of the Iowa coin dealer.

### C.  Undefined Terms

The Coin Dealers admit that "wholesale" and "retail" have widely understood meanings but claim that, in context, they are vague because of the structure of the bullion products market. As for "wholesale," the Coin Dealers claim that this term is vague because, unlike ordinary consumer products, bullion products do not have "an ultimate

consumer"; rather, people often buy and hold bullion products as investments. (ECF No. 21 at 32–33.)

This argument represents an effort by the Coin Dealers to manufacture vagueness where none exists. Undefined words in statutes are construed according to their "common and approved usage." Minn. Stat. § 645.08(1). "Wholesale," as the Coin Dealers acknowledge, has a commonly understood meaning. (ECF No. 21 at 32 (providing a "commonly understood" meaning of "wholesale").) When words used in a statute are "widely understood," they are not unconstitutionally vague. *Duhe v. City of Little Rock*, 902 F.3d 858, 864 (8th Cir. 2018) (citations omitted). The Coin Dealers insist that bullion products do not have an "ultimate consumer" in the same way a box of breakfast cereal does. (ECF No. 21 at 32.) But this difference in product consumption does not mean that people of reasonable intelligence would be unable to determine whether they are engaging in wholesale transactions. Whether one is wholesaling, as the Coin Dealer's definitions illustrate, need not depend on what the end purchaser does with the product.

Further, this subsection is not so vague as to invite arbitrary or discriminatory enforcement. The Court also notes that the subdivision 3(b)(1) exception to dealer status does not directly prohibit any conduct. Rather, it exempts certain merchants from the bullion dealer law's requirements.

The Coin Dealers also assert that the term "consumer" is vague, so they cannot determine whether they are a dealer or whether they have to register. (ECF No. 21 at 33–

34.) The Coin Dealers claim confusion because someone may be both a "consumer" and a "dealer" under the law. They do not explain, however, the basis for their assumption that these must be mutually exclusive categories. Suppose a Minnesota citizen went to a coin shop and bought a bullion product. She is a consumer. If she then goes home and sells the bullion product online to a consumer, she would be a "dealer" under subdivision 3(a)(1) because she would be selling a bullion product to a consumer and is domiciled in Minnesota.[16] Aside from claiming in the abstract that "consumer" is vague, the Coin Dealers have not proposed any scenarios in which a party would be unable to discern whether it is selling to a consumer.

In sum, even though the bullion dealer law does not define several terms, it gives regulated parties fair notice about what conduct is prohibited and it does not invite arbitrary or discriminatory enforcement. *Skilling*, 561 U.S. at 412.

## III.   Preemption

The Coin Dealers' final two challenges to the bullion dealer law are on preemption grounds, and the Court also dismisses these claims. The overarching principle applicable to these challenges is that state laws that interfere with, or are contrary to, federal law are preempted. *Wuebker v. Wilbur-Ellis Co.*, 418 F.3d 883, 886 (8th Cir. 2005) (first citing U.S. Const. art. VI, cl. 2; then citing *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 604 (1991)). There are three types of preemption—express preemption, field preemption, and conflict

---

[16] Assuming that none of the subdivision 3(b) exceptions apply.

25

preemption; only conflict preemption is at issue here. *Id.*; (ECF No. 21 at 34–40.) Conflict preemption occurs if it is impossible to comply with both state and federal laws or if a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (internal quotation and citation omitted). "Congressional intent is the touchstone" of preemption analysis, *Wuebker*, 418 F.3d at 886 (citation omitted), and "courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Arizona*, 567 U.S. at 400 (citations omitted). The Coin Dealers challenge the bullion dealer law as it applies to both coins and IRAs.

### A. Currency

The Court discerns three separate arguments related to currency preemption: (1) the law impermissibly requires a license to do something that federal law authorizes people to do; (2) the law interferes with Congress's policy of maximizing the number of bullion dealers; and (3) the law interferes with Congress's policy of making United States bullion coins widely available.

### 1. Sperry

The Coin Dealers cite *Sperry v. State of Florida ex rel. Florida Bar* for the proposition that a state may not require a license to do something that federal law authorizes. 373 U.S. 379, 385 (1963). Sperry, the plaintiff who was not admitted to practice law in Florida, prepared and prosecuted patents in Florida anyway, and the Florida Bar charged him

26

with the unauthorized practice of law. *Id.* at 381–82. Such activity, though, was expressly permitted by federal statute and the Commissioner of Patents. *Id.* at 384. The Supreme Court, in holding that Florida could not prohibit Sperry's patent prosecution activities, stated that "[a] State may not enforce licensing requirements which, though valid in the absence of federal regulation, give the State's licensing board a virtual power of review over the federal determination that a person or agency is qualified and entitled to perform certain functions." *Id.* at 385 (internal quotations and citations omitted).

*Sperry* has mainly been applied to state rules regarding attorneys' authorization to practice law or agents practicing before a federal agency. *See, e.g., Surrick v. Killion*, 449 F.3d 520, 530 (3d Cir. 2006) ("*Sperry* therefore stands for the general proposition that where federal law authorizes an agent to practice before a federal tribunal, the federal law preempts a state's licensing requirements to the extent that those requirements hinder or obstruct the goals of federal law."); *Baylson v. Disciplinary Bd. of Sup. Ct. of Pa.*, 975 F.2d 102, 111–12 (3d Cir. 1992); *In re Desilets*, 291 F.3d 925, 928–31 (6th Cir. 2002); *Jewell v. Herke*, No. 20-CV-1427 (PJS/DTS), 2021 WL 878896, at *4–5 (D. Minn. Mar. 9, 2021). The bullion dealer law does not regulate parties' ability to practice law or practice before a federal agency. The Court sees no compelling reason to extend the doctrine to cover the Coin Dealers' claims.

Additionally, there is not as significant a conflict here as there was in *Sperry*. In *Sperry*, the Florida Bar's charge against Sperry was directly contrary to federal law. 373

U.S. at 385. One must strain to discern any conflict between the bullion dealer law and federal law. Federal law directs the Secretary of the Treasury to mint certain coins and establishes that they can be used as legal tender. 31 U.S.C. §§ 5112(a), 5112(h), 5112(n), 5112(o), 5112(q). The bullion dealer law requires that bullion dealers meet certain requirements, including registering with the state and obtaining a surety bond. *See generally* Minn. Stat. ch. 80G. The bullion dealer law does not cover the use of coins as currency, because such use would not constitute "buy[ing], sell[ing], solicit[ing], or market[ing] bullion products." Minn. Stat. § 80G.01, subdiv. 3(a). Thus, even if the *Sperry* doctrine applied here, there is no analogous conflict between state and federal law.

    2.  *Congress's Policy to Maximize the Number of Bullion Dealers*

The Coin Dealers next argue that federal law preempts the bullion dealer law because it impedes Congress's policy of maximizing the number of bullion dealers. (ECF No. 21 at 36–37.) In support of this, the Coin Dealers point to a subsection of the Presidential $1 Coin Act of 2005, which states that the Director of the Mint should "ensure that a maximum number of reputable, reliable, and responsible dealers are qualified to offer for sale all bullion coins" issued by the Mint. 31 U.S.C. § 5112(p)(4).

But for a state law to be preempted, it must "stand[] as an obstacle" to achieving the objectives of Congress. *Arizona*, 567 U.S. at 399 (internal quotation omitted). Even assuming that Section 5112(p)(4) evinces Congress's intent to maximize the number of "reputable, reliable, and responsible" bullion dealers generally, rather than just dealers

of the one-dollar coin, the bullion dealer law does not stand as an obstacle to Congress's intent. To the contrary, the bullion dealer furthers Congress's objective, because Congress did not intend only to maximize the number of dealers, but rather to maximize the number of "reputable, reliable, and responsible dealers." 31 U.S.C. § 5112(p)(4). By requiring bullion dealers to register with the state and obtain a surety bond, the bullion dealer law ensures that bullion dealers will be "reputable, reliable, and responsible," so the law is not preempted on this basis.

     3.  *The Mint's Policy to Make Bullion Coins Widely Available*

The Coin Dealers also claim that the bullion dealer law impedes the Mint's policy of making bullion coins widely available. (ECF No. 21 at 37–39.) In support, the Coin Dealers cite a Department of the Treasury document titled, "Procedures to Qualify for the Purchase of Gold, Platinum and Palladium Bullion Coins." (ECF No. 23-3.) This document states that the Mint will use "private sector distribution channels" to ensure that bullion coins are "[a]s widely available to the public as possible." (*Id.* at 3.) In the Coin Dealer's view, the bullion dealer law's requirements and prohibitions conflict with the Mint's policy.

Although federal regulations can sometimes preempt state law, *Wuebker*, 418 F.3d at 887 (citation omitted), the Department of the Treasury's document does not have preemptive force. "[O]nly federal laws 'made in pursuance of' the Constitution . . . are entitled to preemptive effect." *Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1907 (2019)

(plurality opinion) (first quoting U.S. Const. art. VI, cl. 2.; then citing *P.R. Dep't of Consumer Affs. v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988)); *see Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) (explaining that agency materials such as opinion letters, policy statements, agency manuals, and enforcement guidelines do not have the force of law). Evidence of Congress's or an agency's preemptive purpose, either express or implied, must be found in the "'text and structure'" of a statute or regulation. *Va. Uranium*, 139 S. Ct. at 1907 (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)). The statements that the Coin Dealers claim reflect a preemptive purpose are not in a statute or regulation, so they do not preempt the bullion dealer law.

### B. IRAs

The Coin Dealers claim the bullion dealer law is preempted by a federal policy of allowing bullion coins to be held in an IRA. Commissioner Arnold responds that the Coin Dealers lack standing to bring this preemption argument, and even if they have standing, the argument fails. The Court concludes that the Coin Dealers have standing, but that their argument fails.

### 1. Standing

Commissioner Arnold claims that the Coin Dealers have not alleged an injury sufficient to establish standing because there is no real or imminent threat of injury to the Coin Dealers. (ECF No. 29 at 27–29.) To establish standing, the Coin Dealers must show that they: (1) have suffered a cognizable injury; (2) that the defendant caused; and (3) that

would likely be redressed with a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted). For the injury prong, the Coin Dealers must show that they suffered an "invasion of a legally protected interest" that is "concrete and particularized," and "actual or imminent, not conjectural or hypothetical." *Id.* at 560 (internal quotations and citations omitted).

The Coin Dealers have established an "actual or imminent" risk of harm. The Coin Dealers would like to buy bullion products or investments in bullion products in their IRAs or sell such products to consumers' IRAs. (Compl. ¶¶ 183–85.) The Minnesota Commerce Department has audited IRAs to find companies that are selling to Minnesota citizens' IRAs. (ECF No. 1-1.) The Commerce Department has also entered into a consent order with a company alleged to have violated the bullion dealer law by selling bullion products, "primarily in the form of Self-Directed IRAs," to Minnesota consumers. *In re Bullion Produce Dealer TMTE, Inc. Metals.com, Chase Metals, LLC*, 53857/GM, 2020 WL 6205599, at *1 (Minn. Dept. Comm. Sept. 21, 2020). Based on the Commerce Department's past enforcement of the bullion dealer law against dealers mainly transacting in IRAs, the Coin Dealers have established an "actual or imminent risk" of injury. *Lujan*, 504 U.S. at 560.

   2.  *IRA Preemption*

The Coin Dealers have not overcome the presumption against preemption with respect to IRAs. To support their argument that there is a federal policy favoring bullion

products in IRAs, the Coin Dealers cite 26 U.S.C. Section 408, which establishes rules for IRAs. In general terms, Section 408 gives tax advantages to certain retirement accounts. "Collectibles" are excluded from favorable tax treatment, but "collectible" does not include certain bullion products. 26 U.S.C. § 408(m). This, the Coin Dealers claim, shows that Congress has a policy of making bullion coins a permissible IRA investment, meaning that the bullion dealer law is preempted.

Not so. The fact that Congress granted favorable tax treatment to bullion products in IRAs does not necessarily mean that Congress preempted state laws regulating bullion in the same context. Under the Coin Dealers' logic, states would be prohibited from regulating anything that could be held in an IRA: stocks, bonds, real estate investment trusts, and money market accounts, to name a few. The Court cannot glean a "clear and manifest purpose" of Congress to preempt state regulation of bullion products by granting them favorable tax treatment.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.  Plaintiffs' Motion for Summary Judgment (ECF No. 19) is GRANTED IN PART and DENIED IN PART;

    a.      The motion is granted as to Counts Two (Dormant Commerce Clause—Discrimination) and Three (Dormant Commerce Clause—Extraterritoriality);

    b.      The words "in this state" are stricken from Minnesota Statute Section 80G.01, subdivision 3(b)(5); and

    c.      Minnesota Statute Section 80G.07 is stricken.

2.      Defendant's motion to dismiss (ECF No. 26) is GRANTED IN PART and DENIED IN PART; and

    a.      Counts One (Dormant Commerce Clause—Excessive Burden), Four (Void for Vagueness), Five (Currency Preemption), and Six (IRA Preemption) are DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: July 23, 2021               BY THE COURT:

                                         s/Nancy E. Brasel
                                       Nancy E. Brasel
                                       United States District Judge